# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW J. ORMOND, on behalf of the Allergan, Inc. Savings and Investment Plan, the Actavis, Inc. 401(k) Plan, himself, and a class consisting of similarly situated participants of the Plan,<br><br>Plaintiff,<br><br>v.<br><br>ALLERGAN PLC, EMPLOYEE BENEFITS PLAN COMMITTEE OF ALLERGAN PLC, KAREN LING, BRYAN KAVANAUGH, BENEFITS OVERSIGHT COMMITTEE OF ALLERGAN PLC, JOHN DOES 1-20, AND RICHARD ROES 1-20,<br><br>Defendants. | Case No.  17-CV-1554<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      Plaintiff Andrew J. Ormond ("Plaintiff"), on behalf of the Allergan, Inc. Savings and Investment Plan (the "Allergan Plan"), the Actavis, Inc. 401(k) Plan[1] (the "Actavis Plan", and together with the Allergan Plan the "Plan" or the "Plans"), individually, and as representative of the class described herein, brings this action against the herein named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.[2]

---

[1] The Plan was adopted by Watson Pharmaceuticals, Inc. on January 1, 1988. The Plan was amended to change the name of the Plan to the Actavis, Inc. 401(k) Plan effective on January 24, 2013.

[2] All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel.  In particular, Plaintiff through his counsel has reviewed, among other things, documents filed with the U.S. Department of Labor (the "DOL") and the

2.      This case is about the failure of the Defendants, fiduciaries of the Plan, to protect the interests of the Plan's Participants in violation of the Defendants' legal obligations under ERISA.  Defendants breached the duties they owed to the Plans, to Plaintiff, and to the putative class members who are also Participants, by, *inter alia*, retaining common stock of Allergan ("Allergan Stock" or "Company Stock") as an investment option in the Plans when a reasonable fiduciary using the "care, skill, prudence, and diligence – that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

3.      The Defendants permitted the Plans to continue to offer Allergan Stock as an investment option to Participants even after the Defendants knew or should have known that Allergan Stock was artificially inflated during the Class Period (February 25, 2014 and November 2, 2016, inclusive), as alleged in further detail below, making it an imprudent retirement investment for the Plan given its purpose of helping Participants save for retirement. Defendants knew or should have known that material facts about Allergan's business had not been disclosed to the market, causing Allergan Stock to trade at prices above which it would have traded had such facts been disclosed.  Defendants were empowered as fiduciaries to remove Allergan Stock from the Plan's investment options or to take other measures to help Participants, yet they failed to do so or to act in any way to protect the interests of the Plans or their Participants, in violation of Defendants' legal obligations under ERISA.

---

United States Securities and Exchange Commission (the "SEC"), other lawsuits against Allergan plc ("Allergan" or the "Company"), public statements and media reports, and also had discussions with participants and beneficiaries (the "Participants") of the Plan.

Prior to June 15, 2015, Allergan plc was known as Actavis plc.  Allergan plc and Actavis plc are collectively referred to as "Allergan" or the "Company" herein.

4.      In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court confirmed that plan fiduciaries violate ERISA when they continue to offer an imprudent plan investment option.  In *Fifth Third,* the Court considered a class action case similar to this one in which plan participants challenged the plan fiduciaries' failure to remove company stock as a plan investment option.  The Supreme Court held that retirement plan fiduciaries are required by ERISA to independently determine whether company stock remains a prudent investment option.  In that case, the defendant-fiduciaries argued that their decision to buy or hold company stock was entitled to a fiduciary-friendly "presumption of prudence" standard. *Fifth Third*, 134 S. Ct. at 2463.  The Supreme Court rejected that argument, holding that "no such presumption applies," *id.,* and further held "that the duty of prudence ***trumps*** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468 (citation omitted) (emphasis added). Accordingly, the Plan' fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general." *Id*. at 2463.  Thus, even if the Plan purportedly required that Allergan Stock be offered, the Plan' fiduciaries were obligated to disregard that directive once Company Stock was no longer a prudent investment for the Plan.

5.      The thrust of Plaintiff' allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plan' assets in Allergan Stock throughout the Class Period despite the fact that Defendants knew or should have known that that investment was imprudent as a retirement vehicle for the Plan.

6.      Allergan Stock was artificially inflated during the Class Period and the Plans wasted assets by purchasing artificially inflated Allergan Stock.  During the Class Period, the

Company made a series of reassuring statements about Allergan's engagement in conduct that would eventually result in an antitrust investigation by the U.S. Department of Justice and subject it to likely criminal charges for suspected price collusion.

7.      Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as made by Defendants here to retain and/or continue purchasing the clearly imprudent Allergan Stock as a Plan investment.  To remedy the breaches of fiduciary duties as described herein, Plaintiff seeks to recover the financial losses suffered by the Plan as a result of the diminution in value of Company Stock invested in the Plan during the Class Period, and to restore to the Plan what Participants would have received if the Plan's assets had been invested prudently.

**JURISDICTION AND VENUE**

8.      ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

10.      ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more Defendants reside or may be found in this District.  The Actavis Plan lists its address as being in Parsippany, New Jersey, and the Forms 11-K for both Plans show that the Plans' auditors are in Iselin, New Jersey.  While the Allergan Plan lists its address as being in Irvine, California, its most recent Forms 11-K were signed by Karen Ling, whose offices are in Parsippany, New Jersey.

4

## PARTIES

**Plaintiff**

11.     Plaintiff Andrew J. Ormond ("Plaintiff") was an Allergan employee and is a Participant in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Plaintiff suffered losses in his/her individual Plan account as a result of investing in Allergan Stock during the Class Period.

**Defendants**

**(a)     Company Defendant**

12.     Defendant Allergan is a pharmaceutical company that produces branded and generic drugs and performs pharmaceutical research and development. It was formed on February 18, 2015, when the company formerly known as Actavis, Plc changed its name.  This was completed as of June 15, 2015. Actavis, Plc then became Actavis, which now forms the American Generics division of the Company.

13.     At all times relevant to this Complaint, the Company managed and administered the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan, or appointed a committee to do so.

14.     According to § 9.5 of Exhibit 99.2 to a Form S-8 filed by Actavis on March 17, 2015, which is the governing plan document for the Allergan Plan, "[t]he authority and responsibility to manage and control the assets of the Trust are hereby delegated by the Board of Directors, acting through the Committee, to and vested in the Subcommittee except to the extent reserved to the Board of Directors or the Board of Directors, acting through the Committee, or the Sponsor." Section 9.16 of the Allergan Plan also recognizes the Company is a fiduciary of the Allergan Plan:

The members of the Committee, the Subcommittee, the Board of Directors, the Company and any person delegated to carry out any fiduciary responsibilities under the Plan (hereinafter a "delegated fiduciary"), shall be entitled to rely upon any tables, valuations, computations, estimates, certificates and reports furnished by any consultant, or firm or corporation which employs one or more consultants, upon any opinions furnished by legal counsel, and upon any reports furnished by the Trustee or any Investment Manager" .

15.     The Company is also a fiduciary of the Actavis Plan,[3] because the Company hired, and retained the right to terminate, a third party administrator of that Plan's Actavis Stock Fund.

16.     The Company is also a fiduciary of both Plans because both Plans' Forms 11-K filed with the SEC on June 28, 2016, were executed, in part, on behalf of "Allergan plc as Plan Administrator."

17.     At all relevant times, the Company was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

**(b)     The Committee Defendants**

18.     Defendant Employee Benefits Plan Committee of Allergan PLC (the "Committee") is the administrator for both Plans pursuant to the Plans' Forms 11-K filed with the SEC on June 28, 2016.[4]

19.     Defendant Karen Ling ("Ling"), the Company's Chief Human Resources Officer, executed both Plans' Forms 11-K filed with the SEC on June 28, 2016 in her capacity of

---

[3] The governing plan document for the Activis Plan, formerly known as the Watson Pharmaceuticals, Inc. 401(k) Plan (*see supra* n.1) is available at https://www.sec.gov/Archives/edgar/data/1578845/000119312513386308/d604136dex992.htm.

[4] The Actavis Plan's 2016 Form 11-K refers to this Committee as the "Employee Benefits Committee" but, as noted below, defendant Ling is the Chairperson of both committees, which Plaintiff believes to be functionally, if not nominally, the same.

"Chairperson, Employee Benefit Plans Committee". Plaintiff thus believes defendant Ling was a member of the Committee.

20.     Defendant Bryan Kavanaugh, Allergan's Global Director, Executive Benefits, signed both Plans' Forms 5000 Annual Return/Report of Employee Benefit Plan for 2015, each of which was executed on July 11, 2016, in his capacity as "plan administrator." Upon information and belief, Kavanaugh was also a member of the Committee, which was the plan administrator for both Plans.

21.     Defendant Benefits Oversight Committee of Allergan PLC (the "Benefits Committee") is charged with plan governance pursuant to the Plans' Forms 11-K filed with the SEC on June 28, 2016.

22.     John Does 1-20, without limitation, are the unknown members of the Committee and the Benefits Committee, any other committee(s) which administered the Plan, and all members thereof. The identity of the committee(s) and the members of the committee(s) which were responsible for carrying out the provisions of the Plan is currently not known. John Does 1-10 are fiduciaries of the Plan and are believed to be employees of the Company.

23.     The Defendants named in ¶¶ 18-22 herein are referred to herein as the "Committee Defendants."

24.     At all relevant times, the Committee and the John Doe defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

**(c)     The Monitoring Defendants**

25.       Defendants Richard Roes 1-20 (the together with the Company the "Monitoring Defendants") were persons who had the duty and responsibility to properly appoint, monitor and inform the Committee and John Doe defendants (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets.  The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including Allergan's engagement in conduct that would result in an antitrust investigation by the U.S. Department of Justice and subject it to criminal charges for suspected price collusion during the Class Period identified herein) but nonetheless continued to allow such persons to offer Allergan Stock as an investment option under the Plan when the market price of Allergan Stock was artificially inflated and Allergan Stock was an imprudent investment for Participants' retirement accounts under the Plan.  Liability is only asserted against each of the Monitoring Defendants for such periods of time as the Monitoring Defendants acted as a fiduciary with respect to the Plan.

26.       At all relevant times, the Richard Roe defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

**(d)       Additional "John Doe Defendants"**

27.       To the extent there are additional officers and employees of Allergan who were fiduciaries of the Plan during the Class Period, or any other committees or members of such committees that were fiduciaries of the Plan in connection with the allegations herein, the

identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, in addition to the above, other individuals, including, but not limited to, Allergan officers and employees who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## THE PLAN

28.     Both Plans are defined contribution retirement plans within the meaning of ERISA.

29.     The stated purposes of the Allergan Plan "are to permit Active Participants to share in the profits of the Employers, to assist Participants in accumulating savings, to provide retirement income to Participants, and to stimulate in employees the strongest interest in the successful operation of their Employer's business" and "to enable Eligible Employees of Allergan . . . to share in the growth and prosperity of the Company and to provide Participants with an opportunity to accumulate capital for their future economic security."

30.     According to the Form 11-K filed with the SEC on June 28, 2016 for the Actavis Plan:

> ### General
>
> The Plan was adopted by Watson Pharmaceuticals, Inc., and certain subsidiaries (collectively, the "Company") on January 1, 1988. The Plan was amended to change the name of the Plan to the Actavis, Inc. 401(k) Plan effective on January 24, 2013. The Plan is a defined contribution plan covering certain employees of the Company based in the United States who have met certain eligibility requirements. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and is administered by the Employee Benefits Committee of the Company (the "Plans Committee"). The Benefits Oversight Committee is charged with plan governance.

The Plan is intended to be a qualified defined contribution plan, which satisfies the requirements of Section 401(k) of the Internal Revenue Code, as amended (the "IRC").

The Plan Trustee and Custodian is Charles Schwab Bank.

### Plan Sponsor

In 1985 the Company was incorporated under the name Watson Pharmaceuticals, Inc. On January 24, 2013, the Company began trading under a new symbol – ACT – on the New York Stock Exchange and changed its name to Actavis, Inc. pursuant to its acquisition of the Actavis Group. On October 1, 2013, the Company was renamed Actavis plc. In connection with the acquisition of Allergan, Inc., the Company changed its name from Actavis plc to Allergan plc. Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the open of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN." Participants in the Plan have the option of investing in a fund that invests in Allergan plc.

On July 1, 2014, Actavis plc acquired Forest Laboratories, Inc. ("Forest"). At the effective time of the acquisition, Forest employees became eligible to participate in the Plan.

On July 2, 2014, Forest acquired Furiex Pharmaceuticals, Inc. ("Furiex"). At the effective time of the acquisition, Furiex employees became eligible to participate in the Plan.

### Contributions and Eligibility

Participants may contribute up to 75% of pre-tax and/or after tax of his or her eligible pay up to the Internal Revenue Service ("IRS") limit. In addition, participants may make rollover contributions from all other qualified plans.

The Plan provides for immediate eligibility to participate in the Plan. The Company's eligible United States employees are automatically enrolled in the Plan at a pre-tax contribution rate of 3% for both regular pay and performance-based bonus compensation, unless the employee affirmatively elects a different rate. Deferral rates for these participants automatically increase by 1% of eligible compensation annually, every April 1, until it reaches a contribution rate of 8% of your eligible compensation.

Participants who have attained age 50 before the end of the Plan year are eligible to make catch-up contributions.

Effective January 1, 2012, the Company matches 100% of the first 8% of participant contributions up to the IRS limit on a pay period basis. In addition to the matching contributions, the Company may also elect to make discretionary profit sharing contributions. The Company did not make any discretionary profit sharing contributions during the years ended December 31, 2015 or 2014. Effective January 1, 2016, the Company matches 100% of the first 8% of participant contributions up to the IRS limit made on an annual basis.

Participants have the right to elect investment options upon enrollment or re-enrollment into the Plan. Additionally, participants may elect to change their investment options and transfer their account balances among the different investment funds at any time, subject to the Company's insider trading policy.

### Vesting

Participant contributions and related earnings are fully vested immediately. Participants are 50% vested in Company matching contributions and discretionary profit sharing contribution and related earnings after one year and 100% vested after two years. Benefits attributable to each participant will become fully vested in all accounts in the event of death, disability, normal retirement at age 65, or the complete or partial termination of the Plan.

### Participant Accounts

Each participant's account is credited with (a) participant contributions, (b) Company matching contributions, (c) discretionary profit-sharing contributions, if any, and (d) an allocation of investment earnings, losses, or expenses thereon to the participant's account in the same proportion as the participant's beginning account balance invested in the fund (as defined in the Plan) in relation to the total fund balance. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account. Participants direct the investment of their accounts. Changes to these investment elections are allowed at any time.

31.    At year end 2013, close to the start of the Class Period, the Actavis Plan held over

$44 million in Actavis plc common stock, accounting for 819,093 units.  By year end 2014, the

Actavis Plan held 1,004,628 units worth $83,052,578, and by year end 2015, the Actavis Plan held 1,226,579 units worth $122,927,711.[5]

32.      According to the Form 11-K filed with the SEC on June 28, 2016 for the Allergan Plan:

> ### General
>
> The Plan, established on July 26, 1989, is a defined contribution plan sponsored by Allergan, Inc. On March 17, 2015, Allergan plc (formerly known as Actavis plc) (the "Company" or the "Employer") acquired Allergan, Inc. (the "Allergan Acquisition"). As a result of the acquisition, the Company became the sponsor of the Plan. The Plan covers certain eligible employees of the Company as defined below. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and is qualified under the Internal Revenue Code (the "Code"). The administrator for the Plan is the Employee Benefits Committee of the Company (the "Plan Committee"). The Benefits Oversight Committee is charged with plan governance.
>
> On March 17, 2015, the Company terminated the Allergan, Inc. Employee Stock and Ownership Plan, and the assets were transferred to the Plan and the employees became eligible to participate in the Plan.
>
> As of December 31, 2014, JP Morgan Chase Bank NA ("JP Morgan") was the Trustee and Custodian. Effective June 12, 2015, Great-West Trust Company, LLC ("Great West") was appointed Trustee and holds all the investment other than the Allergan plc stock. JP Morgan remained the Custodian for the Allergan plc stock.
>
> ### Plan Sponsor
>
> In connection with the acquisition of Allergan, Inc., the Company changed its name from Actavis plc to Allergan plc. Actavis plc's

---

[5] According to the Form 11-K filed on behalf of the Activis Plan on June 28, 2016 (the "Activis 2016 11-K"), "The Allergan plc Company Stock Fund is a unitized fund comprised of company stock and cash equivalents which is valued at the closing price reported on the active market plus any cash on hand in the fund. The Allergan plc Company Stock Fund contained $122,927,711 of Allergan plc common stock and zero of cash equivalents as of December 31, 2015." Similar representations in prior Forms 11-K show the Actavis plc Company Stock Fund held $161,458 in cash at year end 2013.

ordinary shares were traded on the NYSE under the symbol "ACT"
until the open of trading on June 15, 2015, at which time Actavis
plc changed its corporate name to "Allergan plc" and changed its
ticker symbol to "AGN." Participants in the Plan have the option
of investing in a fund that invests in Allergan plc.

### Contributions and Eligibility

The Plan provides for immediate eligibility to participate in the
Plan. The Company's eligible United States employees may
contribute a portion of their defined compensation, on a before tax,
after tax basis (including Roth 401(k)), or a combination thereof,
subject to the limitations as defined by the Code.

Participants who have attained age 50 before the end of the Plan
year are eligible to make catch-up contributions.

The Company's eligible Puerto Rican employees may contribute a
portion of their defined compensation, either before tax, after tax,
or a combination thereof, subject to the limitations as defined by
the Puerto Rico Internal Revenue Code.

Participants direct the investment of their contributions into
various investment options offered by the Plan through the Master
Trust. The plan administrator, or its delegate, regularly consults
with an investment advisor to evaluate investment performance
and, based thereon, will add or remove investment options.

The Plan authorizes the Company's Board of Directors, or its
delegate, to change the Company's matching contribution levels
from time to time in an amount not to exceed 5% of each
employee's defined compensation. For the years ended
December 31, 2015 and 2014, the Employer made matching
contributions equal to 100% of each employee's contribution up to
5% and 4%, respectively, of defined compensation. Effective
January 1, 2015, the Participant must be employed on the last day
of the Plan year to receive Employer matching contributions.

The Company also makes an annual retirement contribution equal
to 5% of each participant's defined compensation if they are
eligible for the Retirement Contribution feature of the Plan, have
completed at least six months of service, and are employed on the
last business day of the year (or terminated employment during the
year due to death, disability or retirement, defined as age 55+).

Participants have the right to elect investment options upon
enrollment or re-enrollment into the Plan. Additionally,
participants may elect to change their investment options and

transfer their account balances among the different investment funds at any time, subject to the Company's insider trading policy.

### Vesting

Participant contributions are fully vested at all times. Participants forfeit their share of non-vested employer contributions if they terminate their employment before becoming 100% vested. Employer matching contributions vest based on a cliff vesting of three years of service. After three years of service, all employer matching contributions are fully vested. Employer retirement contributions vest on a graduated basis, 20% per year until fully vested at the end of the fifth year of service.

### Participant Accounts

Each participant's account is credited with the participant's contributions, employer match and employer retirement contributions and allocations of fund earnings and charged with an allocation of administrative expenses and fund losses. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account. Participants direct the investment of their accounts.

33.     SEC filings for the Allergan Plan show that the value of Allergan plc common stock was $206,668,491 (1,860,519 shares/units)  as of December 31, 2013, $280,032,814 as of December 31, 2014, and $428,218,376 as of December 31, 2015.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Allergan, Inc. Savings and Investment Plan and/or the Actavis, Inc. 401(k) Plan at any time between February 25, 2014 and November

2, 2016, inclusive,[6] and whose Plan accounts included investments in Company Stock.

35.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least tens of thousands of members of the Class. For example, the Allergan Plan's 2015 Form 5500 shows that there were 7,962 participants in the Allergan Plan at the start of 2015, and the Actavis Plan's 2015 Form 5500 shows that there were 11,527 participants in the Actavis Plan at the start of 2015.

37.     At least one common question of law or fact exists as to Plaintiff and all members of the Class, which common question will resolve an issue that is central to the validity of each Class member's claims in one stroke.  Multiple such questions of law and fact common to the Class exist, including, but not limited to:

      (a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

      (b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

      (c)     whether Defendants violated ERISA; and

---

[6] Plaintiff reserves their right to modify the Class Period definition in the event further investigation/discovery reveals a more appropriate and/or broader time period during which Allergan Stock constituted an imprudent investment option for the Plan.

(d)      whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.      Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

39.      Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because he/she has no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

40.      Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

41.      Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

42.      On February 25, 2014, the first day of the Class Period, Allergan filed an Annual Report for 2013 on Form 10-K (the "2013 10-K"), reporting its financial performance for 2013.  The 2013 10-K stated, in part:

**Business Strategy**

We apply three key strategies to achieve growth for our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances, challenging patents associated with these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business. Our Medis third-party business has a broad portfolio of over 175 developed products for out licensing to approximately 330 customers, primarily in Europe. Our Anda Distribution business distributes products for approximately 400 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business also distributes a number of generic and brand products in the U.S. Growth in our Anda Distribution business will be largely dependent upon FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

43.      The 2013 10-K also stated:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,725 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

44.      The 2013 10-K further stated that

**Competition**

The pharmaceutical industry is highly competitive. In our Actavis Pharma and Actavis Specialty Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality and price, reputation and service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as Authorized Generics. Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG). Refer to "ITEM 1A. RISK FACTORS – Risks Related to Investing in the Pharmaceutical Industry – The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors" in this Annual Report.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations. Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. Our competitors in brand products include major brand name manufacturers of pharmaceuticals. Based on total assets, annual revenues and market

capitalization, our Actavis Specialty Brands segment is considerably smaller than many of these competitors and other global competitors in the brand product area. Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do. If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, and for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

In our Anda Distribution business, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both brand and generic pharmaceutical products to their customers. These same companies are significant customers of our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses. As generic products generally have higher gross margins than brand products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on brand products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler. As we do not offer as broad a portfolio of brand products to our customers as some of our competitors, we are at times competitively disadvantaged. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share. . . .

45.     On April 30, 2014, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 8-K").  The press release stated, in part:

"Actavis began 2014 with our strongest quarter ever, bolstered by growth across our global business," said Paul Bisaro, Chairman and CEO of Actavis.

"Overall revenue growth of 36 percent in our commercial pharmaceutical business benefitted from the continued strength of our generics business, resulting from the launch of our generic Micardis® in the U.S. and continued strong sales of the generic versions of Lidoderm® and Cymbalta®. Our North American Brands, which includes the benefit of the expanded portfolio

resulting from the acquisition of Warner Chilcott in October 2013, saw continued strong sales of core products in the U.S., including Rapaflo® and Generess® Fe. We also saw growth in international operations, driven by strong sales and new product launches in key countries including the UK, Russia and Sweden.

"Along with solid performance that exceeded our forecast, we continued to focus on future growth drivers through investment in R&D across the business, and within the U.S. generic business, the announcement of a patent settlement for our generic version of Daytrana®, and initiation of patent challenges on a number of products, including generic forms of Treanda®, Multaq® and Colcrys®. Additionally, on April 1, 2014, we completed the divestiture of our generics commercial operations in seven markets in Western Europe to Aurobindo Pharma Limited.

46.     On August 5, 2014, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 8-K").  The press release stated, in part:

"Our exceptional performance during the second quarter resulted from double digit revenue growth in both our North American brand and generics businesses and Anda Distribution," said Paul Bisaro, who became Executive Chairman of Actavis on July 1, 2014 following the close of the acquisition of Forest Laboratories and the second quarter.

"Overall revenue growth of 31 percent in our commercial pharmaceutical business was supported by our North American Brands business, which benefitted from the expanded portfolio resulting from the acquisition of Warner Chilcott in October 2013, as well as continued strong sales of core products in the U.S. We also saw strong growth within our generics business, powered by our strong base business along with continued strong sales of the generic versions of Lidoderm® and Cymbalta®. Revenue in our international operations reflected the divestiture of our generics commercial operations in seven markets in Western Europe to Aurobindo Pharma Limited in April 2014."

47.     On November 5, 2014, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's

financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 8-K").

The press release stated, in part:

> "Our 53 percent year-over-year growth in non-GAAP EPS reflects the strong contributions of our new brand pharmaceutical portfolios, resulting from the acquisitions of Warner Chilcott and Forest, as well as the continued strong performance of our U.S. Generics and International businesses and the Anda Distribution business," said Brent Saunders, CEO and President. "During the quarter, our North American Brands business was driven by strong sales from key products including our Namenda® products, Bystolic®, Linzess®, Lo Loestrin® Fe, Estrace® Cream, Daliresp® and Tudorza¹. During the quarter we completed the harmonization of our U.S. brand sales and marketing functions, and we now have a fully operational sales team in place to support our seven core therapeutic categories across all prescriber audiences. Within our North American Generics business, we capitalized on continued strength across the business. We also saw strong commercial performance in key international markets, particularly the UK and Russia.

> * * *

> "When I outlined our roadmap for accelerated growth last quarter, we committed to driving balanced performance across brands and generics, retaining our commitment to invest in organic growth and accelerating integration and synergy capture. We can report substantial progress across the board."

48.      On February 18, 2015, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q4 2014 8-K").

The press release stated, in part:

> "Our fourth quarter results demonstrate our laser-like commitment to drive strong growth and sustainable value creation across our businesses, while simultaneously executing transformative business development initiatives," said Brent Saunders, CEO and President of Actavis. "In our North American Brands business, six of our top ten brand products saw double-digit growth, including our strongest performers Namenda® franchise, Linzess®, Estrace®Cream, Teflaro® and Bystolic®. In our North American Generics business, strong results were driven by continued

performance of our generic versions of Lidoderm® and Concerta®, and fourth quarter launches of generic versions of Intuniv̂   and Celebrex®. We continue to invest in expanding our brand and generic portfolios, with nine new product and line extension launches planned in 2015, and industry-leading expansion of our generic pipeline, with 44 Abbreviated New Drug Applications (ANDAs) submitted in 2014. At year end, we had more than 65 first-to-file Abbreviated New Drug Applications (ANDAs) and approximately 230 ANDAs in total pending at the U.S. Food and Drug Administration (FDA). Internationally, our business continues to grow and expand through new product launches, and we have more than 1,200 Marketing Authorization Applications (MAAs) pending outside of North America.ö

49.     On February 18, 2015, Allergan also filed an Annual Report for year end 2013

on Form 10-K (the õ2014 10-Kö), reporting its financial performance for 2013.  Allergan stated,

in part:

### Business Strategy

We apply three key strategies to achieve growth for our North American Brands and North American Generics and International businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances as it relates to generics, challenging patents associated with these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business. The Company also develops and out licenses generic pharmaceutical products through its Medis third party business. Our Anda Distribution business distributes products for approximately 340 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business distributes a number of generic and brand products in the U.S. Growth in our Anda Distribution business will be largely dependent upon customer expansion, FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

50.     The 2014 10-K also stated: õWe believe that we are able to effectively compete

in the distribution market, and therefore optimize our market share, based on three critical

elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,650 SKUs

for responsive customer service that includes, among other things, next day delivery to the entire

U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.ö

51.     The 2014 10-K further stated:

**Competition**

The pharmaceutical industry is highly competitive. In our North American Brands and North American Generics and International businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name and generic manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations. Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. Our competitors in brand products include major brand name manufacturers of pharmaceuticals. Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do. If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, and for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

We actively compete in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents and regulatory exclusivity for brand name products expire or are successfully

challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost-effective manner to maintain our revenues and gross profit. In addition to competition from other generic drug manufacturers, we face competition from brand name companies in the generic market. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics". Our major competitors include Teva Pharmaceutical Industries, Ltd., Mylan Inc. and Sandoz, Inc. (a division of Novartis AG). Refer to "ITEM 1A. RISK FACTORS – Risks Related to Investing in the Pharmaceutical Industry – The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors" in this document.

In our Anda Distribution segment, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both brand and generic pharmaceutical products to their customers. These same companies are significant customers of our North American Brand and North American Generics and International businesses. As generic products generally have higher gross margins than brand products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on brand products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler. As we do not offer as broad a portfolio of brand products to our customers as some of our competitors, we are at times competitively disadvantaged. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share.

52.     On May 11, 2015, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 8-K").   The press release stated, in part:

> "Actavis achieved exceptional operational performance while simultaneously focusing on the completion of the Allergan acquisition and accelerating the integration of our combined company to create a Growth Pharma leader," said Brent Saunders, CEO and President of Actavis. "I am proud of our combined team for maintaining their focus on our customers and delivering tremendous operational results."
>
> "Our first quarter performance was highlighted by strong revenue growth from Namenda XR®, Linzess®, Bystolic®, Viibryd®/ Fetzima®, LoLoestrin® Fe, Saphris®, Estrace® Cream as well as continued growth within our generics business, powered by strong sales of the generic versions of Concerta®, Intuniv® and the recent launch of our generic version of OxyContin®.

53.     On July 27, 2015, Teva Pharmaceutical Industries Ltd.  announced that it signed a definitive agreement with Allergan plc to acquire Allergan Generics, Alergan's global generic pharmaceuticals business.

54.     On August 6, 2015, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2015 8-K").  The press release stated, in part:

> "In our first full quarter as a combined Company, Allergan delivered exceptional results. Our performance was powered by operational excellence and double-digit growth across our Brands and Global Generics businesses, while continuing outstanding momentum on the integration of Actavis and Allergan. We also achieved important R&D milestones that will help fuel both our branded and generics businesses in the future," said Brent Saunders, CEO and President of Allergan. "I am thankful to our more than 30,000 global employees for their commitment to our customers and for driving another quarter of outstanding results."

> "We continue to strengthen our leadership position in key
> therapeutic areas through a strong focus on organic productivity,
> while also executing business development agreements to
> complement and build on our position in those therapeutic areas.
> Agreements to acquire Kythera, Oculeve and Naurex, and our
> agreement to license Merck's CGRP migraine program are perfect
> complements to our existing products in Eye Care, Aesthetics and
> Central Nervous System," added Saunders. "Allergan also recently
> made the bold decision to divest its generics business to Teva and
> to streamline its operations with laser sharp focus on its future as a
> branded Growth Pharma leader."

55.     On November 4, 2015, Allergan issued a press release attached as Exhibit 99.1

to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's

financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 8-K").

The press release stated, in part:

> "Allergan delivered exceptional performance across the board in
> the third quarter that exceeded expectations. These strong results
> were driven by our continued focus on customers, fueling volume-
> driven year-over-year growth in our U.S. Brands, Medical
> Aesthetics, International Brands and Anda Distribution segments,
> while also executing pre-integration activities ahead of the
> divestiture of the Generics business to Teva, which remains on
> track to be completed in the first quarter of 2016," said Brent
> Saunders, CEO and President of Allergan. "I would like to thank
> our more than 30,000 global employees for their continued laser
> focus as we continue to better serve our customers, their patients
> and transform Allergan into a branded Growth Pharma leader."

56.     On February 22, 2016, Allergan issued a press release attached as Exhibit 99.1

to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's

financial and operating results for the quarter ended December 31, 2015 (the "Q4 2015 8-K").

The press release stated, in part:

> As a result of the announced proposed divestiture of Allergan's
> Global Generics business to Teva on July 27, 2015, the financial
> results of the Company's Global Generics business are being
> reported as discontinued operations in the condensed consolidated
> statements of operations beginning with the third quarter 2015.
> These portions of the Company's results will continue to be

reported as discontinued operations until the close of that transaction. The Global Generics business delivered solid performance during the fourth quarter. Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments. All prior year results have been recast to reflect continuing operations results.

* * *

"We have also made important progress with Teva on the planned divestiture of our Global Generics business. And in November, Pfizer and Allergan announced the proposed combination of the two companies ó adding Allergan's leading products across seven therapeutic areas and robust mid-to-late stage R&D pipeline to Pfizer's leading innovative and established businesses, vast worldwide commercial operations and discovery R&D leadership to create a new biopharma leader," added Saunders.

57.     On February 26, 2016, Allergan filed with the SEC an Annual Report for 2015 on Form 10-K (the ò2015 10-Kö), reporting its financial performance for 2015.  Allergan stated, in part:

**Business Strategy**

We apply three key strategies to achieve growth for our US Brands, US Medical Aesthetics and International Brands businesses: (i) internal development of differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business. Our Anda Distribution business distributes products for approximately 340 suppliers and is focused on providing next-day delivery and responsive service to its customers. Our Anda Distribution business distributes a number of branded products in the United States. Growth in our Anda Distribution business will be largely dependent upon customer expansion, FDA approval of new generic products in the U.S. and expansion of our base of suppliers.

58.     The 2015 10-K also stated:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 13,200 SKUs for responsive

customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities. . . .

59.     The 2015 10-K further stated:

**Competition**

The pharmaceutical industry is highly competitive. In our US Brands, US Medical Aesthetics and International Brands businesses, we compete with different companies depending upon product categories, and within each product category, upon dosage strengths and drug delivery systems. Such competitors include the major brand name manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand product business requires us to identify and bring to market new products embodying technological innovations. Successful marketing of brand products depends primarily on the ability to communicate their effectiveness, safety and value to healthcare professionals in private practice, group practices and receive formulary status from managed care organizations. We anticipate that our brand product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities. Our competitors in brand products include major brand name manufacturers of pharmaceuticals. Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do. If we directly compete with them for certain contracted business, such as the Pharmacy Benefit Manager business, or for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

In our Anda Distribution segment, we compete with a number of large wholesalers and other distributors of pharmaceuticals, including McKesson Corporation, AmerisourceBergen Corporation and Cardinal Health, Inc., which distribute both

branded and generic pharmaceutical products to their customers. These same companies are significant customers of our US Brands and US Medical Aesthetics businesses. As generic products generally have higher gross margins than branded products for a pharmaceutical distribution business, each of the large wholesalers, on an increasing basis, are offering pricing incentives on branded products if the customers purchase a majority of their generic pharmaceutical products from the primary wholesaler. As we do not offer as broad a portfolio of branded products to our customers as some of our competitors, we are at times competitively disadvantaged. Increased competition in the generic industry as a whole may result in increased price erosion in the pursuit of market share. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Our Anda Distribution operations compete directly with significant customers of our generic and branded businesses" in this document.

As a result of the Teva Transaction, the Company's global generics business is classified as discontinued operations. Our discontinued operations actively competes in the generic pharmaceutical industry. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents and regulatory exclusivity for brand name products expire or are successfully challenged, the first off-patent manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products, market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenues and gross profit attributable to a particular generic product normally is related to the number of competitors in that product's market, pricing and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. We face competition from other generic drug manufacturers and from brand name companies in the generic market. Many of these companies seek to participate in sales of generic products by, among other things, collaborating with other generic pharmaceutical companies or by marketing their own generic equivalent to their brand products as "Authorized Generics".

60.     On May 10, 2016, Allergan issued a press release attached as Exhibit 99.1 to a

Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial

and operating results for the quarter ended December 31, 2015 (the "Q1 2016 8-K"). The press release stated, in part:

> **Discontinued Operations**
>
> As a result of the proposed divestiture of Allergan's Global Generics business to Teva on July 27, 2015, the financial results of the Company's Global Generics business are being reported as discontinued operations in the condensed consolidated statements of operations. These portions of the Company's results will continue to be reported as discontinued operations until the close of that transaction. Continuing operations includes the U.S. Brands, U.S. Medical, International Brands and Anda Distribution segments. All prior year results have been recast to reflect continuing operations results.

61.     On August 8, 2016, Allergan issued a press release attached as Exhibit 99.1 to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's financial and operating results for the quarter ended December 31, 2015 (the "Q2 2016 8-K"). The press release stated, in part:

> "2016 has been a year of significant, positive transition for Allergan. On August 2, we announced the completion of the divestiture of our Global Generics business, and on August 3, announced the proposed divestiture of our Anda distribution business, to Teva. These steps position Allergan as a pure branded focused business able to maximize the power of its therapeutic areas and the promise of its leading Open Science pipeline of 65+ mid-to-late stage development programs," added Saunders.
>
> * * *
>
> **Discontinued Operations and Continuing Operations**
>
> As a result of the decision to hold for sale our Anda Distribution business as of June 30, 2016, which we subsequently announced we are selling to Teva, and the now completed divestiture of the Company's Global Generics business to Teva on August 2, 2016, the second quarter 2016 financial results of these businesses are being reported as discontinued operations in the condensed consolidated statements of operations. The Company's Anda Distribution results will be reported as discontinued operations until the close of that transaction. A portion of the third quarter

2016 Global Generics business results will be reported as
discontinued operations in Allergan's third quarter 2016 earnings
report. Included in segment revenues are product sales that are sold
by the Anda Distribution business once the Anda Distribution
business has sold the product to a third party customer. These sales
are included in segment results and are excluded from total
continuing operations revenues through a reduction to Corporate
revenues. Cost of sales for these products in discontinued
operations is equal to our average third-party cost of sales for
third-party brand products distributed by Anda Distribution.

62.     On November 2, 2016, Allergan issued a press release attached as Exhibit 99.1

to a Current Report on Form 8-K filed with the SEC, announcing certain of the Company's

financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 8-K").

The press release stated, in part:

### Discontinued Operations and Continuing Operations

As a result of the completed divestiture of the Company's Global
Generics business to Teva on August 2, 2016, and the completed
divestiture of the Company's Anda distribution business to Teva on
October 3, 2016, the third quarter 2016 financial results of these
businesses are being reported as discontinued operations in the
condensed consolidated statements of operations. Included in
segment revenues are product sales that were sold by the Anda
Distribution business once the Anda Distribution business had sold
the product to a third party customer. These sales are included in
segment results and are excluded from total continuing operations
revenues through a reduction to Corporate revenues. Cost of sales
for these products in discontinued operations is equal to our
average third-party cost of sales for third-party brand products
distributed by Anda Distribution.

63.     The above statements failed to disclose that: (i) Allergan and several of its

pharmaceutical industry peers colluded to fix generic drug prices in violation of federal antitrust

laws, creating excess revenues as a result of anticompetitive behaviors and putting Allergan at

risk of criminal prosecution and civil and criminal penalties, among other things.

**THE TRUTH IS REVEALED**

64.     On August 6, 2015, Allergan filed a Quarterly Report on Form 10-Q with the

SEC, reiterating the financial and operating results announced in the Q2 2015 8-K , and further

disclosing that:

> *Actavis.* On June 25, 2015, the Company received a subpoena
> from the U.S. Department of Justice ("DOJ"), Antitrust Division
> seeking information relating to the marketing and pricing of certain
> of the Company's generic products and communications with
> competitors about such products. The Company intends to
> cooperate fully with the DOJ's requests.

65.     Also on August 6, 2015, *Bloomberg* published an article titled "Allergan

Brought Into Widening U.S. Probe of Generic Drug Prices," revealing that "Allergan Plc's

Actavis unit got a subpoena from the U.S. Justice Department seeking information on the

marketing and prices of its generic drugs, becoming the biggest company yet to draw scrutiny in

the government's widening antitrust probe of the industry," and noting that Allergan joined other

companies who "have made similar disclosures in the past several months."

66.     Allergan's share price fell $17.17 per share, or approximately 5%, from its

previous closing price, to close at $319.47 per share on August 6, 2015.

67.     On November 3, 2016, *Bloomberg* reported, in an article entitled "U.S. Charges

in Generic-Drug Probe to Be Filed by Year-End," that:

> U.S. prosecutors are bearing down on generic pharmaceutical
> companies in a sweeping criminal investigation into suspected
> price collusion, a fresh challenge for an industry that's already
> reeling from public outrage over the spiraling costs of some
> medicines.
>
> The antitrust investigation by the Justice Department, begun about
> two years ago, now spans more than a dozen companies and about
> two dozen drugs, according to people familiar with the matter. The
> grand jury probe is examining whether some executives agreed
> with one another to raise prices, and the first charges could emerge
> by the end of the year, they said.

> Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.
>
> All of the companies have said they are cooperating except Covis, which said last year it was unable to assess the outcome of the investigation.
>
> * * *
>
> Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.

68.     Allergan's share price fell $9.07, or approximately 4.58%, to close at $188.82 per share on November 3, 2016.

69.     On December 15, 2016, *The Wall Street Journal* reported that "The Justice Department is expected to remain active in pursuing generic-drug price fixing after bringing its first criminal charges this week, according to a personal familiar with the matter."

### WHAT DEFENDANTS SHOULD HAVE DONE DURING THE CLASS PERIOD

70.     Defendants, as Allergan insiders, knew or should have known that the Company was conspiring to raise its profits in violation of antitrust laws.  Rather than continue to make short-term profits at the risk of long-term fines and penalties, Defendants should have taken action to protect the Plan from holding and purchasing artificially inflated Allergan Stock.

71.     Disclosure might not have prevented the Plan from taking a loss on Company Stock it already held, but it would have prevented the Plan from acquiring (through Participants' uninformed investment decisions and continued investment of matching contributions) additional

shares of artificially inflated Company Stock.  The longer the concealment continued, the more of the Plan's good money went into a bad investment; full disclosure would have cut short the period in which the Plan bought Company Stock at inflated prices.

72.     Rather than doing nothing (as they did), Defendants could have taken numerous steps to fulfill their fiduciary duties to the Plan under ERISA.  As set forth more fully below, none of those steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the Plan's Allergan Stock holdings than to help it, and could have avoided or mitigated the harm caused to the Plan.

73.     Defendants could have (and should have) directed that all Company and Plan Participant contributions to the Company Stock Fund be held in cash or some other short-term investment rather than be used to purchase Allergan Stock.  A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of Allergan Stock.

74.     Defendants also should have closed the Company Stock Fund to further contributions and directed that contributions be diverted from Company Stock into prudent investment options based upon the Participants' instructions or, if there were no such instructions, the Plan's default investment option.

75.     Neither of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws.  Nor would the Plan ceasing to purchase additional Company Stock likely send a negative signal to the market.

76.     Alternatively, Defendants could have disclosed (or caused others to disclose) Allergan's legal issues so that Allergan Stock would trade at a fair value.

77.     Given the relatively small number of shares of Allergan Stock purchased by the Plan when compared to the market float of Allergan Stock, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the price of Allergan Stock.

78.     Further, Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

79.     Instead of taking any of the above actions, or any other action, to protect the Plans, Defendants ignored the artificial inflation in Company Stock in administering their fiduciary duties. Defendants knew that the Plan was intended to be a safeguard for Participants' retirement savings, and that Participants' contributions were being wasted, in part, by being invested in artificially inflated Allergan Stock.

### Defendants Allowed Allergan's Stock to be Hyped Instead of Protecting the Plan

80.     During the Class Period, Allergan and the other Defendants continued to issue misstatements about Allergan's competitive industry, keeping Allergan Stock artificially inflated while failing to take any of the above actions.  The truth would only be revealed months later, that, as discussed above, Allergan was colluding with its peers.

### THE RELEVANT LAW: CLAIMS FOR RELIEF UNDER ERISA

81.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact

performs fiduciary functions for the Plan, is also considered a fiduciary of the Plan.  A person or

entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

82.     At all relevant times, Defendants are/were, and acted as, fiduciaries within the

meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

83.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

84.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

85.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

86.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the highest known to the law and entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an õeye singleö to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)     the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

87.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

88.     ERISA § 405(a), 29 U.S.C. § 1105 (a), õLiability for breach by co-fiduciary,ö provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his

specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

89.     Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

## FAILURE TO PRUDENTLY MANAGE THE PLAN'S ASSETS IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405

## (BY THE COMPANY AND THE COMMITTEE DEFENDANTS)

90.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

91.     This Count alleges fiduciary breaches against the Company and the Committee Defendants (collectively, the "Prudence Defendants") for continuing to allow the investment of the Plan's assets in Allergan Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Allergan Stock was artificially inflated during the Class Period.

92.     At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

93.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all

investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent. The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

94.     Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of Allergan Stock. An adequate investigation by Defendants would have revealed the risks of investing in artificially inflated Allergan Stock and caused a reasonable fiduciary to conclude that the Fund was over-valued and likely to fall in price during the Class Period. A prudent fiduciary would have acted to prevent or mitigate the losses that the Plan experienced during the Class Period, but the Defendants failed to do so.

95.     The Prudence Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect the Plan's Participants.

96.     The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding Allergan's true financial condition and, generally, by conveying inaccurate information regarding the Company's business and industry. During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock. As such, Participants could not

appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Fund.

97.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning Allergan's business activities, any generalized warnings of market and diversification risks that Defendants made to Participants regarding the Plan's investment in the Fund did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company Stock.

98.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet the Prudence Defendants made no effort to remedy those breaches.

99.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants, lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock, and refrained from spending hundreds of millions of dollars on artificially inflated Allergan Stock, and thereby eliminated, or at least reduced, losses to the Plan and themselves.

100.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by Defendants' breaches of fiduciary duties alleged in this Count.

## COUNT II

## BREACH OF DUTY OF LOYALTY IN
## VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405

### (BY ALL DEFENDANTS)

101.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

102.    This Count alleges fiduciary breaches against the Company, Monitoring Defendants and Committee Defendants (collectively, the "Loyalty Defendants"), for continuing to allow the investment of the Plan's assets in Allergan Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Allergan Stock was artificially inflated during the Class Period.

103.    At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

104.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

105.    The duty of loyalty includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries."

106. During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them, by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock (even though an independent fiduciary was appointed soon after Allergan Stock ceased being artificially inflated); and, by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

107. During the Class Period, upon information and belief, certain Defendants, including the Monitoring Defendants, made direct and indirect communications with the Plan's participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock. These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions). Defendants, including the Monitoring Defendants, also acted as fiduciaries to the extent of this communication activity.

108. Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning employees' natural bias toward investing in company stock, including that:

(a) Out of loyalty, employees tend to invest in company stock;

(b) Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c) Employees tend not to change their investment option allocations in the plan once made; and

42

(d)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

109.   Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plan participants. Defendants, however, disregarded their duties of loyalty, to the benefit of the Company, as demonstrated by the Plan's massive holding and purchase of Company Stock with Plan assets.

110.   Further, to the extent that Allergan satisfied its Plan matching obligations using artificially inflated employer securities which it already held, Defendants, who knew or should have known Allergan Stock was artificially inflated, participated knowingly and significantly in deceiving Participants in order to save the employer money at the Participants' expense, which violates ERISA's duty of loyalty.

111.   The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet the Loyalty Defendants made no effort to remedy them.

112.   As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plan and its participants, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiff and the other Participants, lost a significant portion of their retirement investments.

113.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION IN VIOLATION OF ERISA § 404

### (BY THE COMPANY AND THE MONITORING DEFENDANTS)

114.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

115.     This Count alleges fiduciary breaches against the Monitoring Defendants.

116.     At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose and prudence.

117.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of, other Plan fiduciaries, namely the Prudence Defendants.

118.     Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

119.     The monitoring duty further requires that the appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for

obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

120.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

121.    During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b)    failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

(c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

(d)     failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

122.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

123.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, and enabled the breaches by those Defendants, and they failed to make any effort to remedy those breaches despite having knowledge of them.

124.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

125.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

126.    The wasting of Participants' retirement savings in artificially inflated Allergan Stock could have and would have been avoided, in whole or in part, by Defendants complying with their ERISA-mandated fiduciary duties.

127.    Defendants – who knew or should have known that Allergan Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire

further Allergan Stock, while taking no action to protect their wards as Allergan's condition worsened and the Participants' retirement savings lost tens of millions of dollars. Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and the Participants.

128. To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, at least the following alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

129. First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock Fund be held in cash rather than be used to purchase Allergan Stock. The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions. This action would not have required any independent disclosures that could have had a materially adverse effect on the price of Allergan Stock.

130. Second, Defendants should have closed the Fund to further contributions and directed that contributions be diverted from Company Stock into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

131. Third, Defendants could have disclosed Allergan's problems, discussed above, so that Allergan Stock ceased being artificially inflated.

132. Alternatively, Defendants could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

133.    Instead, Defendants waited until the Plan had suffered tens of millions of dollars in losses during the Class Period because of artificial inflation in Allergan Stock to take any of the protective actions discussed above.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

134.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

135.    ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

136.    As noted above, the Plan and its Participants have suffered tens of millions of dollars in damages as a result of Defendants' breaches of fiduciary duty.  Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plan to make good to the Plan for the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other

applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

137.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

**JURY DEMAND**

Plaintiff demands a jury.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A.    A judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan and the Participants during the Class Period;

B.    A judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    A judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    A judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan participants' individual accounts in proportion to the accounts' losses;

E.    A judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Allergan

Stock maintained by the Plan in proportion to the accountsø losses attributable to the decline in the price of Allergan Stock;

      F.     A judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

      G.     A judgment awarding attorneysø fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

      H.     A judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  March 7, 2017

By:  _s/ Gary S. Graifman_____
Gary S. Graifman
**KANTROWITZ, GOLDHAMER
    & GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Telephone:    (201) 391-7000
Facsimile:    (201) 307-1088
Email:        ggraifman@kgglaw.com

**STULL, STULL & BRODY**
Michael J. Klein  (*Pro Hac Vice to be requested*)
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email: mklein@ssbny.com

**ATTORNEYS FOR PLAINTIFF**